1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 12-cr-00406-WJM-1

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    LAWRENCE ROLLAND THIEL,

8        Defendant.

9    _____

10   **REPORTER'S TRANSCRIPT**
     (Sentencing)

11   _____

12       Proceedings before the HONORABLE WILLIAM J. MARTÍNEZ,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 10:03 a.m., on the 4th day of June,

15   2013, in Courtroom A801, United States Courthouse, Denver,

16   Colorado.

17   **APPEARANCES**

18       Kurt J. Bohn, Attorney at Law, U.S. Attorney's

19   Office-Denver, 1225 17th Street East, Suite 700, Denver, CO

20   80202, appearing for the plaintiff.

21       Matthew Kyle Belcher, Attorney at Law, Office of the

22   Federal Public Defender, 633 Seventeenth Street, #1000, Denver,

23   CO 80202, appearing for the defendant.

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Gwen Daniel, 901 19th Street,
25   Room A259, Denver, Colorado, 80294, 303.571.4084

1          **PROCEEDINGS**

2          (In open court at 10:03 a.m.)

3              THE COURT:  We are on the record in 12-cr-406, United

4     States of America vs. Lawrence Thiel.

5              I'll take appearances of counsel.

6              MR. BOHN:  Your Honor, Kurt Bohn from the United

7     States Attorney's Office on behalf of the United States.

8              THE COURT:  Good morning.

9              MR. BELCHER:  Good morning, your Honor.  Matthew

10    Belcher on behalf of Mr. Thiel, who is in custody and seated to

11    my left at counsel table.

12             THE COURT:  Good morning to the two of you.

13             Will the probation officer please identify yourself

14    for the record.

15             THE PROBATION OFFICER:  Good morning, your Honor.

16    Michelle Means, probation.

17             THE COURT:  Good morning.

18             Mr. Belcher, will you and your client please approach

19    the lectern.

20             MR. BELCHER:  Yes, your Honor.

21             THE COURT:  Ms. Hansen, will you please administer the

22    oath to the defendant.

23         (Defendant sworn.)

24             THE COURT:  The record will reflect that on the 11th

25    of February 2013, Mr. Thiel entered a plea of guilty to and was

convicted of Count Two of an Indictment charging him with being

a felon in possession of a firearm, in violation of 18, United

States Code, Section 922(g)(1) and 924(a)(2).

Are you having trouble hearing me, Mr. Thiel?

THE DEFENDANT:  I just have bad hearing on one side.

THE COURT:  I will get the mike closer, and I will try

to speak louder.

THE DEFENDANT:  Thank you, your Honor.

THE COURT:  We are here for the sentencing of the

defendant.  For the record I have carefully reviewed the

following documents:  The final Presentence Investigation

Report and the addendum thereto, the probation officer's

sentencing recommendation, the Pretrial Services' report, the

Information, the Plea Agreement, as well as all the

sentencing-related filings and motions of the parties.

I will hear now from counsel regarding the parties'

respective sentencing recommendations and the reasons for the

recommendation.

Mr. Bohn.

MR. BOHN:  Your Honor, I would also ask that the Court

allow the government a chance to comment upon Mr. Thiel's

allocution, which often comes before the government's argument,

to address his position.

I would like to ask the Court, first of all, to deny

the defense's motion to disregard the way the 2K2.1 was

1  formulated based upon the empirical evidence that was before

2  the commission.  I don't believe there has been any case law

3  provided to the Court to give you any reason to really find or

4  be concerned as to the gradual approach that was taken by the

5  commission.

6           I think if the Court does that then we start off where

7  we are required to start off, which is calculating the

8  appropriate and the correct advisory guideline range for your

9  consideration.

10          If the Court does that then I think the probation

11  report in docket 27-1 does state the total Offense Level is 25

12  and a Criminal History Category VI, which makes the advisory

13  guideline range 110 to 120 months, and I think that's where we

14  start with that calculation.

15          With that said, your Honor, then we really fall into

16  the consideration of, under the facts of 3553(a), what's an

17  appropriate sentence for this individual.  This is an

18  individual who is before you today with 18 criminal history

19  points from 12 felonies.  That alone is a tremendous number.

20  It's a tremendous number especially when you take into account

21  that he has ten offenses that got zero criminal history points,

22  zero, because of time, because of whatever factors.

23          When you look back through this report, and it's a

24  lengthy, well documented report, there's a couple of things

25  that jump out at you.  Basically, Mr. Thiel, who stands before

1    you at age 50, when this started, he literally has gone no more

2    than approximately three years of his life, adult life, where

3    he's not been incarcerated at any one time.

4         That's really the problem here.  I mean you are

5    talking about in excess of over 22 times he's been in front of

6    a judicial officer.  I mean 12 felonies.  And when you look at

7    this, you break this down and you say he was sentenced -- the

8    times that you look at this, in 2005, March 2005 he was paroled

9    for an assault, which he had received a six-year sentence, he

10   only did five years of that.  He was out for three years,

11   basically, and he was picked up in February '08 for a weapons

12   offense.  He's not allowed to possess.

13        Then again the next longest period of time of his

14   adult life was really from an assault that occurred in 2008.

15   He then was discharged -- actually January of 2010, he gets

16   nine months, he comes out, he basically has less than two

17   years, when he was arrested on this offense.

18        That's an adult life that has been spent in and out of

19   prison with how many judicial officers -- how many officers who

20   sat where you do and asked Mr. Thiel:  When is enough enough?

21   How many judicial officers have said:  I am going to take a

22   chance on you, Mr. Thiel.

23        I am going to ask you today this time to say enough is

24   enough.  Because how many officers have done the same thing?

25             And that's significant to this Court.  Because to ask

1    for a sentence of 120 months is not a lenient sentence.  It's

2    not.  Even the defense motion involves a substantial period of

3    time.  And that's what my colleague will tell you, that 63

4    months is a lot of time, and it is.

5         But the probation officer's comments to you for the

6    justification is really well founded.  Mr. Thiel cannot, for

7    whatever reason, conform his behavior to the laws of society.

8    He can't.  And it's unfortunate.  The few times I've had a

9    chance to interact with Mr. Thiel, he can be a very polite,

10   engaging individual.  The problem is it's in a controlled

11   environment.  So whether he's a nice gentleman when you have

12   him alone in a confined environment, that's not the same

13   Mr. Thiel that lives among society.  It's not.  It's not even

14   close to the same guy.  When you look at the reasons and the

15   factors of why you would sentence an individual to 120 months,

16   this is the case where you say it's for the protection of

17   society.  This is that case.

18        When you look at the range of sentencing, advisory

19   Guideline ranges, and you look and say if you are a VII, VIII

20   or IX, the range might be 51 to 63 months, you might say he's a

21   Criminal History Category IX, at nine points, then maybe 63

22   months is appropriate.  This gentleman is at 18.  They don't

23   even make a number for that.  And that's because at this point

24   society has an overarching, overwhelming need to be protected.

25   And that's really a concern.

1       The second thing I would ask the Court to consider

2   when you listen to Mr. Thiel's comments is, you know, sometimes

3   when you have a person come before you in a firearm case,

4   they've got a reason why they have a gun.  It may not be a good

5   reason:  Well, you know what, I came back home, I was living

6   with my wife my kids, whatever, we live in a very violent

7   neighborhood.  There's other alternatives.

8       But that's not the case with Mr. Thiel.  He did not

9   live in a part of town that was gang invested and crime-ridden.

10  He lived out in a motor home without anyone to bother him.  And

11  he didn't have a gun, he had two guns.  Why?  See, that's

12  what's really missing.  There's not one basis for Mr. Thiel to

13  possess a gun, except for the fact that Mr. Thiel simply cannot

14  conform his behavior.

15      And then I would ask the Court to find by a

16  preponderance of the evidence the facts that were laid out in

17  the Plea Agreement and are found here, which is that he

18  threatened two individuals with guns.  That is the type of

19  behavior that leads to innocent individuals being hurt, or

20  retaliating and Mr. Thiel being hurt.  That's the protection

21  side we're talking about.

22      Your Honor, this is in one hand a very easy case to

23  make a recommendation for 120 months.  The criminal history and

24  the body of work put together for Mr. Thiel is unique of a

25  lifetime of adult behavior.

1       If someone could come before you and say, You know

2   what, he had a ten, 12, 20-year period of time where he didn't

3   have any law enforcement contact, and he had something terrible

4   happen, and now he's got his life straight, that's different.

5   That's not this case.

6       Your Honor, this is the case where I would ask you to

7   adopt the recommendation of the probation officer for the

8   reasons that have been articulated and impose -- I know it's a

9   very severe sentence, your Honor, it is, but it's not made

10  lightly.  It's simply the only way to ensure that society will

11  be protected from Mr. Thiel.  It's the only choice you have in

12  this case to guarantee society's protection.

13      THE COURT:  Thank you, Mr. Bohn.

14      Mr. Belcher.

15      MR. BELCHER:  Thank you, your Honor.

16      As the government has already alluded to, and I am

17  sure the Court has read in our motion, we're asking for a

18  sentence within a range of 51 to 63 months.  And before getting

19  into how I came up with that range or my issues with the

20  Guidelines, I think as a whole, taking a step back, the

21  government's argument here today, in my opinion, highlights the

22  problems I've put forth in my motion to this Court.

23      Not only the Presentence Report, but the government as

24  well, and rightly so, has focused on his criminal history and

25  where the guideline range is found -- recommends.  The

1    guideline range should be followed is the argument.  The

2    guideline range is reasonable.  The guideline range takes into

3    account everything.  The guideline range is infallible.  It

4    should be followed.

5         The problem being, while I can't speak for either of

6    the other parties what their recommendation would be, but I

7    have a strong suspicion that if the Guidelines came out to 77

8    to 96 months, they'd be arguing the same thing, for 96 months,

9    or lower.

10        Now maybe there's a point where the government says

11   enough is enough, the criminal history category underrepresents

12   the risk to society, and asks the Court for an upward

13   departure.

14        But the problem is the basis for the government's

15   recommendation, probation's recommendation, is the guideline.

16   Simply put:  This is what the guideline says and this is why

17   you should impose a sentence within the Guidelines.

18        The problem being is if you look to the Guidelines,

19   the reason why the Guidelines are supposed to be a rough

20   approximation of what a sentence should be, you find a jumbled

21   mess, where the government suggested a gradual increase over

22   the years, where I highlighted a 570 percent increase in a very

23   short period of time, from '87 to '91.  It went from Mr. Thiel

24   looking at 18 to 24 months, to Mr. Thiel's recommendation being

25   well over the statutory maximum.  And that happened within a

1  very short period of time.

2         This was not a gradual increase over the years,

3  getting feedback from jurists, from the bench, from the

4  frontline actors, from the ATF, from activists, from law

5  professors reviewing presentence reports, trying to figure out

6  what sentence is being imposed and why they are being imposed.

7         That's the reason why the Supreme Court has

8  consistently over the years, **Rita, Kimbrough, Gall**, every other

9  case that's come down, has consistently said the reason why the

10  Guidelines are still a factor -- they're not mandatory, but the

11  reason why they are still relevant is because they are a rough

12  approximation of what the sentences were, what the sentences

13  are being given to these individuals and why.

14         The startling difference with this guideline, along

15  with some others that have been subject to attacks over the

16  years, is that the commission itself, doing its job, gets a

17  working group to look at all the presentence reports, to look

18  at what sentences are being imposed, to look at what ATF, what

19  judges, what other people are recommending, they get that

20  report.  On one hand the report says:  Well, it looks like this

21  18 to 24 months range is low.  Everyone is getting near the

22  high end and some people are getting above the guideline range.

23  So we should probably do something from that.  It goes from

24  nine to 12 and eventually 14.  Telling, if you look at that

25  14-VI, your Honor, would be 37 to 46 months.

1    And in my motion, through the study group's report,

2 when they were looking at everything, average sentences for

3 Category V and Category VI offenders under 2K2.1, strangely

4 enough, were within that 37 to 46 month range.

5    So on one hand the working group, doing its job,

6 looking at it, says:  It's a little low, we need to adjust

7 this.  The adjustment for the base offense level would put

8 Mr. Thiel in the range of where people were getting it, given

9 his criminal history.

10    But they didn't stop there, despite finding, based on

11 their empirical research and their empirical study, that

12 whatever the reasons why judges were giving higher sentences,

13 and they set out those reasons, they weren't linked to certain

14 prior convictions.  There was no correlation.  Or if there was,

15 there wasn't a strong correlation between them.

16    So despite finding that, and despite presenting that

17 finding to the commission, not only did they adjust the base

18 offense level — which I can't even argue, that makes sense,

19 it's the whole reason the commission was even founded, to look

20 at what's going on and adjust the averages — they did that, but

21 they went a step further and decided that in Mr. Thiel's case,

22 based on a prior conviction 13 years ago, an attempted assault

23 second, which is a misdemeanor, absent the fact that the person

24 was a police officer, based on that one single prior conviction

25 13 years ago, for some reason the guideline should double 50

1    percent, despite having no empirical evidence saying that

2    judges were doing that.  That:  Oh, man, we haven't accounted

3    for this fact.  Okay?

4         THE COURT:  Have you looked enough into this,

5    Mr. Belcher, to answer the question of -- 18 to 24, now we're

6    at a guideline range, depending on the criminal history

7    category, at the statutory maximum.  You know, that's a

8    quadrupling or quintupling.  Have you researched this enough to

9    know why it is -- was this congressionally-driven or what

10   caused this?

11        MR. BELCHER:  I think it was -- I can't tell you for

12   sure, but my research, from what I've read, Law Review

13   articles, different opinions, and so forth, is that I think it

14   was driven when in 1991, at the same time all this was going

15   on, the Armed Career Criminal Act came into effect, saying that

16   certain individuals should get 15 years to life.

17        And in my view it was a startling difference from what

18   the individual was looking at guideline-wise.  So say in 1987,

19   '88, '89 -- I think in '89 his guideline had been changed from

20   30 to 37 months by that time.  But looking at 30 to 37 months,

21   and all of a sudden saying that person that was looking at 30

22   to 37 months is now getting 15 years in prison, mandatory, in

23   my opinion, as often has been the case in other arenas in the

24   Guidelines, I believe the commission started adjusting it to

25   try to get it into a more close ballpark with armed career

 1    criminal.  But I can't tell you.  This is Mr. Belcher speaking
 2    from what he's read.
 3         THE COURT:  Right.  I understand.
 4         MR. BELCHER:  I can't tell you that smart people above
 5    me have ever said that.
 6         THE COURT:  All right.  Let me ask you this.  I think
 7    you in your motion, in terms of some of the issues and points
 8    you've raised with respect to this guideline, I think you've
 9    raised some good points, but Mr. Bohn's focus is not so much
10    the guideline, but on the person you have standing next to you.
11         MR. BELCHER:  Right.
12         THE COURT:  If we had a Criminal History Category VII
13    or VIII or IX, your client would be in it.  So the difference
14    in this particular case, I see it, as I have -- the legal
15    argument you've raised with respect to this guideline, which I
16    think with another defendant would have greater weight with me
17    in terms of considering all those issues that you raised.  But
18    with your client, someone with that criminal history category,
19    and also it's not just -- here's my main concern with what
20    happened here.  If your client had been found with a gun under
21    his bed, I would be looking at this very differently.  And you
22    are right, his last serious crime was in 2000, the assault on
23    the peace officer.
24         But in the instant offense what you have is, according
25    to the stipulated facts, your client threatening a family.  He

1    drove by a family with three children in the car and waved the

2    gun at them and drove the car off the road.  Then in the other

3    incident he shot at the home of an individual that was involved

4    in the foreclosure of his property.

5           So those are pretty threatening.  I think, speaking as

6    a father and as a husband, you know, driving my car with my

7    kids in the car, and someone is driving by me, and running me

8    off the road and waving a gun at me, it's hard for me to think

9    of a more menacing and threatening event.

10          And so I think Mr. Bohn's arguments resonate a lot

11   with me in terms of the protection of the public, given what he

12   did in this instant offense as opposed to what he did 13 or 20

13   or 30 years ago.

14          MR. BELCHER:  Your Honor, first of all, valid point.

15   And in our motion, I am sure the Court is aware, we haven't

16   tried to say that the Court shouldn't take specific offense

17   characteristics of what Mr. Thiel is alleged of doing into

18   account in sentencing.

19          I think the problem I am trying to highlight is the

20   fact that we're starting out at an elevated base offense level,

21   creating a 50 percent swing in the Guidelines, not based on

22   what Mr. Thiel did, not based on what Mr. Thiel is accused of,

23   not based on anything that has to do with this instant offense.

24          So, for instance, starting out at the 14, no one is

25   arguing that you should get an increase for -- in connection

1  with a felony offense.  While I suggest an obliterated serial

2  number is elevated, we've never suggested that that's not a

3  specific fact unique to one person's case versus someone that

4  didn't have an obliterated serial number firearm.

5          So ignoring my argument for a second, just saying four

6  levels there too, you've got a guideline range there of 63 to

7  78 months.  If Mr. Bohn wants to argue that Category VI is

8  insufficient to take into account Mr. Thiel's actual criminal

9  history, that's an argument that can be made and an upward

10  departure and variance can be made.

11          The problem is we're starting out above the statutory

12  maximum, and it's now turned to me, or the defense, having to

13  say, well, wait a minute, we're not here because of the

14  specifics or anything specifically to do with the offense,

15  which is the whole point of the Guidelines, is to try to punish

16  people for their specific offense characteristics.  No one is

17  suggesting that the allegations or the obliterated serial

18  number shouldn't be taken into account.  But if you take out

19  this random 50 percent increase based on a 13-year-old prior

20  conviction, you are still looking at 63 to 78 months.

21          And if the Court listens to the government, they want

22  to say underrepresentation of criminal history.  If they think

23  there should be a systematic increase to take into account that

24  it should be Category IX instead of VI, if you look at how I,

25  II, III, IV, V and VI line up in the criminal history

1  categories, you are not going to have a 60-month increase if

2  you go out three levels to a category IX.  They don't enhance

3  that much.

4       And the whole point of that is the criminal history

5  category takes into account the arguments that are being made

6  that are obvious.  He has a lengthy criminal history.  Criminal

7  history deals with the risk of recidivism.  And I get it.

8       I can see the argument being made that 63 to 78

9  months, Okay, we think it should be higher, but we're still not

10  talking about above stat max.  And the only reason we are there

11  is because of that.  If we were at a 14 I think we'd be having

12  a whole different argument from the government saying 78 months

13  isn't enough, do a 4A1.3 upward departure for

14  underrepresentation of criminal history.  Because then they'd

15  be looking at what he did, what happened in this case and

16  whether or not Category VI is sufficient to resolve the risk of

17  recidivism.  But we're elevated not for any of that, but based

18  on something unrelated to this case.

19       And I guess that's the best way I can describe my

20  dispute with the Guidelines, your Honor.  I understand certain

21  things have to be taken into account with Mr. Thiel.  I am not

22  trying to hide his criminal history, nor could I if I tried.  I

23  get that.  I get what happened here.  But I think the only

24  reason we're talking about a stat max is because the Guidelines

25  put us there in the first place.

1          THE COURT:  All right.  Thank you.

2          Let's turn, Mr. Belcher, to your objections to the

3    Presentence Investigation Report, that being ECF 24.  I think

4    you had two objections.  I think you would agree with me the

5    first one is now moot because Ms. Means agreed with the point

6    on paragraph 62.

7          MR. BELCHER:  I agree, your Honor.

8          THE COURT:  All right.  So the objection No. 1 is

9    denied as -- or overruled, rather, as moot.

10          Let's turn to your second objection.  In some ways

11    we're getting the cart before the horse, but because it's an

12    objection, I'll take it now.  You address what you characterize

13    as the warrantless search condition of supervised release that

14    the Probation Office has recommended I include in the judgment.

15    Can you address that, please.

16          MR. BELCHER:  Yes, your Honor.  It's interesting the

17    Court refers to the "cart before the horse," because I think

18    our number one objection to it is it's unconstitutional, but

19    obviously that wouldn't be an issue before a court or ripe

20    until the unfortunate occurred, where it happened, a client is

21    in custody and being charged with something based on

22    probation's recovery of something.

23          THE COURT:  Right.

24          MR. BELCHER:  The primary purpose of the objection,

25    your Honor, is first and foremost to make sure to preserve

1   Mr. Thiel, and I do this with my other clients, that he's not
2   agreeing to this waiver of his Fourth Amendment rights or
3   waiving any Fourth Amendment rights.

4        But, secondly, putting to the Court that I believe,
5   from my review of the case law, that this is an
6   unconstitutional search and that we shouldn't be putting in
7   conditions of supervision that are unconstitutional.

8        And the reason I say that, your Honor, is as I pointed
9   to **Knights** and **Samson**, which the probation officer has also in
10  its response, **Knights** deals with a probation issue, **Samson**
11  deals with a parole issue.  The key difference in both of those
12  that I've highlighted is that the Supreme Court has found (1)
13  that people on supervision, probation, they still have Fourth
14  Amendment rights.  Those don't go away.  They might be somewhat
15  diminished.  But typically based on an agreement by the
16  probationer or the parolee to abide by certain conditions or
17  I'm going to go to prison or I am going to stay in prison
18  longer.  So as a condition precedent of getting a break on your
19  sentence.

20       So in **Knights** specifically the Court found the fact
21  the defendant consented to this search condition greatly
22  diminished his expectation of privacy.  The same thing goes for
23  parole.  The state is going:  Hey, look, we're going to let you
24  out of your prison sentence early, but the only reason we are
25  going to be doing this is if you agree to X, Y and Z.  If you

don't agree to X, Y and Z, we're going to keep you in prison.

The probation in **Knights** was the same thing: We'll offer you

probation instead of sending you to prison, but you are going

to have to agree to this.

So those agreements, in my opinion, are the biggest

difference than what we have now. Supervised release is not a

continuum of the incarceration will. You are not saying: You

agree to the search condition and we'll let you out of prison

early or we won't send you to prison. This isn't something

that affects his release, that if he agrees to, then he's

getting consideration and it's -- you know, everyone is happy.

Here he doesn't have a choice in the matter. He's not

consenting to it, and he's not getting released early, or

anything of that nature. It's just: We're going to search

your house without a warrant.

And I understand probation saying this is nationally

approved by whatever confederation, or whatever that was, but

that doesn't mean that it's constitutional. And the Supreme

Court has never ruled on it, and until such time, we'll be

objecting to it.

THE COURT: Okay.

Mr. Bohn.

MR. BOHN: Regarding just the search condition, your

Honor, the complaint has been made to preserve the record, and

I understand that, but this is a term that the states have used

1  for years, and I think it has been used for years in the state

2  as a tool to help the defendant re-acclimated into society.

3  If there ever was a case, again, to have a search

4  condition imposed, it would be someone like Mr. Thiel, who has

5  absolutely failed at every chance to acclimate into society.

6  This is the one case where there was a firearm in the

7  residence and a firearm in the vehicle, is just reasons why

8  these are the type of tools a probation officer needs to assist

9  Mr. Thiel.

10  Courts don't put people on supervised release as a

11  form of punishment.  I mean I have never heard a judge ever say

12  that to me, Well, you know -- to a defendant, I am going to

13  punish you additionally by putting you on supervised release.

14  Courts, when a person violates supervised release, are often

15  reluctant to terminate, because they view supervised release as

16  a mechanism to assist someone like Mr. Thiel reintegrate into

17  society.

18  This condition, which is not simply:  I am just going

19  to walk in because I feel like it.  It's Tuesday, so I am going

20  to walk into your residence.  There's requirements, there's

21  training.  This is not such a deprivation of liberty, your

22  Honor, that it should not be included into the special terms

23  and conditions of supervised release.

24  THE COURT:  When you say the state system uses this

25  frequently, is it in the context of probation or parole or

1    specifically on supervised release?

2         MR. BOHN:  Well, I mean Mr. Belcher is correct, the

3    view of the state -- supervised release does not really equate

4    apples to apples with the state system, but it is a term that's

5    analogous, because they have the ability to search the

6    residence to basically make sure that the defendant -- or the

7    person they release is living in a manner that's consistent and

8    conducive to success.

9         THE COURT:  But are these individuals who are on

10   parole or -- I don't know the -- you know, I never did criminal

11   law before I got on the bench, so I am having -- you know, 28

12   months, and I am just getting the federal part of it down.  I

13   don't know the state court system.  So you can educate me.  Is

14   there a supervised release in state court?

15        MR. BOHN:  No.

16        THE COURT:  All right.  So we're talking about

17   parolees or probationers.

18        MR. BOHN:  Right.  And I would defer to probation, who

19   is probably better trained on the exact terminology of it all

20   in this concept.  Mr. Belcher can correct me.  There are

21   different terms.  They come out, then they step down.  So to

22   the extent you have specific questions, I might defer to

23   probation, who is better suited to answer it for us without me

24   misstepping.

25        But it is a common condition of parole that the state

1  has and has been used for years in the State of Colorado.

2       THE COURT:  But then that brings up Mr. Belcher's

3  argument, which is there's a big difference between parole and

4  supervised release.  Parole is a continuation of a sentence,

5  and the courts in -- I guess it was **Samson** with respect to

6  parole, recognized that conditions can be placed upon release

7  on parole because it's the -- the alternative would be the

8  defendant can reject it and stay in his prison cell.  But

9  there's a difference.  With supervised release the custodial

10  sentence has ended.

11       MR. BOHN:  But probation is not.  Probation is more

12  analogous to supervised release, because it is a substitute, in

13  a sense, to confinement, and is often made a term of it.  So

14  you're crafting terms of the supervised release.  It's like why

15  do courts then impose upon an individual urinalysis?  Why do

16  the courts impose you've got to take drug treatment classes?

17       Well, making them provide a urine sample -- you know,

18  to get a urine sample, often you've got to get a search

19  warrant.  But courts routinely impose, you know, that

20  individuals have to comply with urinalysis testing, they've got

21  to routinely provide a sample.  Which then means what?  How

22  many times have you already in 28 months seen your supervision

23  come back because a guy can't stay off methamphetamines once

24  they get back out?  Happens all the time.  They show back up in

25  front of you because they are possessing methamphetamine,

1    they're using methamphetamine.  They've tested positive.

2    They've failed to show up to classes where the courts said

3    you've got to be there.

4           To be required to give a urine sample without a

5    warrant on a regular basis is no more invasive than having a

6    probation officer, when they have a reasonable suspicion of

7    needing to investigate your home to make sure you are complying

8    with the terms of your supervision, that's normal.

9           THE COURT:  I disagree with you there.  I think

10   there's a vast difference between being required —— if you are

11   convicted of a drug offense, to be required to give a urine

12   sample than having someone show up at your home.  I mean if

13   there was anything more sacred that the Fourth Amendment was

14   meant to protect, it is your person and your home.

15          MR. BOHN:  Well, the urine sample is your person.  I

16   mean you simply cannot get a person to provide a urine —— if

17   one of our law enforcement officers wanted to obtain or a

18   probation officer —— if a probation officer walks up and says

19   to one of the people they are supervising, You look a little

20   odd, I want to know if you are using drugs, and you as the

21   Court have not put that term in your required supervised

22   release, that they've got to comply with providing urine

23   samples, what mechanism would that probation officer have to

24   obtain a urine sample other than seek a warrant?  They

25   wouldn't.

1          And the point is -- my colleague does a good job of

2     trying to frame this issue as some sort of deprivation of

3     liberty.  When we come back to the real reason of supervised

4     release, I mean the point -- the reason courts don't simply

5     say, You know what, Mr. Thiel, congrats, you've done your time

6     in prison, we are going to let you out now, you are done, the

7     reason courts have supervised release is to help them

8     assimilated and give them encouragement and a mechanism and

9     support.  That is all a part -- if we don't do things like this

10    in a case, specifically Mr. Thiel, then you really have to ask

11    yourself why are we making them give urine samples.  I mean

12    because people who have drug problems need encouragement to

13    know:  You've got a drug problem.  You need to stay off the

14    methamphetamines.  And to make you do it, I am going to order

15    you to provide a urine sample.  Without any real probable

16    cause, without even reasonable suspicion.

17          You have a lower standard of the conditions that you

18    apply, your Honor, when you say provide a urine sample at the

19    discretion of the probation officer every month.  They have no

20    reasonable suspicion.  That individual shows up and provides a

21    sample thereby without any suspicion whatsoever.  Where a

22    probation officer cannot go into a residence and perform a

23    search on a whim.  I mean it's a higher standard already.

24          And I would think that would give the Court comfort,

25    that the Court's own probation officers, who work for the Court

1    and are enforcing your terms of supervised release, are

2    entrusted to assist a guy -- a gentleman like Mr. Thiel in

3    success.

4         And I think this term, your Honor, has been upheld.

5    As my colleague just said, there's not one Tenth Circuit case

6    that has found that this is an improper term.

7         To the extent that it becomes relevant and retroactive

8    to Mr. Thiel, if he's in confinement when it comes up, then an

9    order can be done.  But I would suggest to the Court until some

10   higher authority comes down and says that this is an improper

11   term, I would suggest that it's an appropriate mechanism to

12   give your probation officers a tool to help these people

13   succeed.

14        THE COURT:  Well, I don't need a higher -- I don't

15   need a Tenth Circuit decision, and everything, before I can

16   make any decision, otherwise I would be a rather impotent

17   judicial officer up here.

18        MR. BOHN:  I would agree.  If we had to wait for a

19   decision, we wouldn't all be standing here, I would agree.  But

20   I would suggest to the Court that it's the absence of law to

21   the contrary that lends supports to this.  This is a common

22   term that has been enforced as part of the term of supervision

23   in other districts.

24        And, again, I would defer -- if the Court has specific

25   questions, I would defer to the training probation has got,

 1   because I can't tell you how many other districts have had this

 2   term.  I would like to think that there's -- although I find my

 3   colleague to be very talented, he's probably not the only

 4   talented federal public defender who has raised this issue in

 5   other districts, and it would have been brought up at some

 6   point.

 7          I would suggest -- before the Court grants his motion,

 8   I would ask the Court to possibly consider discussing it with

 9   probation to see how many districts have had this and for how

10   long.  It might be benefical for everyone's consideration.

11          THE COURT:  I do have a question, Ms. Means, for you.

12   Does the state court system have supervised release similar to

13   what we have in the federal system?

14          THE PROBATION OFFICER:  No, your Honor.  They have

15   either probation or parole.

16          THE COURT:  All right.  Is this term used frequently

17   in those settings, parole and probation?

18          THE PROBATION OFFICER:  Yes.

19          THE COURT:  All right.  Thank you.

20          Mr. Belcher, I'll give you a very brief reply to the

21   points raised by Mr. Bohn on your objection.

22          MR. BELCHER:  I think my arguments are still the same,

23   your Honor.  The only thing I would highlight, in reply to what

24   the government has said, is I think it's wholly different to

25   say probation officers can come rolling into a house, than

1  saying, Please come to our office and give us a urine sample.

2  I think we're talking about massive differences in the degree

3  of invasiveness, not to mention the fact that we're dealing in

4  this with your castle, your home, which from day one, as far

5  back as I've read, in Supreme Court case law has been an

6  elevated -- one of the highest regarded safety nets that there

7  is, that you are just not going to let people roll into other

8  people's homes without a warrant.

9          THE COURT:  All right.  Thank you.

10         All right.  I am going to sustain the defendant's

11  second objection.  I agree with the distinction Mr. Belcher has

12  made in his objection regarding the inapplicability of the

13  decision of the U. S. Supreme Court in **United States vs.**

14  **Knights**, 534 U.S. 112.  In that case the Supreme Court held

15  that a warrantless search of a probationer's apartment,

16  supported by reasonable suspicion and consented to by the

17  defendant as a condition of probation, was reasonable within

18  the meaning of the Fourth Amendment.

19         But in that case the Court attached considerable

20  significance to the probationer's acceptance of a clear and

21  unambiguous search condition as a condition of his probation,

22  finding that it significantly diminished the defendant's

23  reasonable expectation of privacy.

24         The difference I see here is that a search condition

25  is not a condition precedent to obtaining probation, which is

 1    an alternative to a sentence of imprisonment or to obtaining an

 2    early release from a sentence of incarceration by means of

 3    parole, but here in this case is a proposed condition to a

 4    separate and distinct period of supervised release.

 5            I agree with the defendant that the key distinction

 6    here is that, unlike probation and parole, supervised release

 7    is not an alternative to or a continuation of a custodial

 8    sentence.  As a consequence, it cannot be a condition which the

 9    defendant would have to accept before he is released from

10    prison.  Because supervised release does not even begin until

11    after a defendant's prison sentence has been completed, it

12    cannot be considered an alternative to or a continuation of a

13    custodial sentence.

14            I agree, therefore, with the defendant, that the logic

15    and reasoning underlying the Supreme Court's decision in the

16    **Knights'** case, and as well in **Samson vs. California**, 547 U.S.

17    843, are not applicable here.

18            I should note for the record that I've recently been

19    seeing this recommended condition of supervised release from

20    the Probation Office much more frequently.  I have adopted this

21    recommendation condition in prior cases.  But the defendant in

22    this case has, in my view, raised some very valid points

23    regarding the Fourth Amendment implications of such a

24    condition, one that I think I probably should have raised and

25    considered and noted on my own before.

1          Ms. Means, I would appreciate it if you would tell

2    your management team when you return to your office that in the

3    future I will not be adopting this recommended condition,

4    except in very extraordinary circumstances, for supervised

5    release.

6          THE PROBATION OFFICER:  I will, your Honor.

7          THE COURT:  Thank you.

8          All right.  Turning to the government's motion for an

9    additional one-level reduction in the offense level for

10   acceptance of responsibility, ECF 21.  There being no

11   objection, that motion is granted.

12         The government's motion to dismiss Count One of the

13   Indictment, ECF No. 22.  There being no objection, that motion

14   is granted as well.  Count One of the Indictment is dismissed.

15         Pursuant to the Sentencing Guidelines and the terms of

16   the parties' Plea Agreement, which the Court has accepted, as

17   well as the Court's rulings on the government's motions, the

18   Court finds the total Offense Level in this case is 25.  The

19   probation officer has determined that the defendant's Criminal

20   History Category is VI.  Neither party has filed an objection

21   to this determination.  Given the applicable statutory maximum,

22   this yields an advisory guideline sentencing range of 110 to

23   120 months, a period of supervised release of one to three

24   years, a fine range of 10,000 to $100,000 and a special

25   assessment of $100.

1       Do counsel agree that the Court has correctly

2   calculated the guideline sentencing range in this case?

3       Mr. Bohn.

4       MR. BOHN:  The United States does.

5       MR. BELCHER:  Yes, your Honor.

6       THE COURT:  Thank you, counsel.

7       All right.  Before ruling on the defendant's motion

8   for a downward variant sentence, I will consider the statutory

9   sentencing factors set forth in Section 3553(a) in light of the

10  specific facts of this case.

11      With respect to the history and characteristics of

12  this defendant, the documents of record indicate that Mr. Thiel

13  is a citizen of the United States and is 50 years old.  He has

14  been married three times, although he is currently single.

15      The defendant attended school through the ninth grade

16  in Long Beach, California.  He earned his GED from the

17  San Quentin State Prison in 1988.  He attended culinary school

18  while incarcerated and has been certified as a heavy equipment

19  operator in the past.  In the time period immediately preceding

20  his arrest for the instant offense, the defendant operated

21  Larry's Tree Service and LT's Towing in southern Colorado.

22      With regard to the defendant's criminal history,

23  according to the PSIR he has no juvenile criminal

24  adjudications.  He has been assessed 19 criminal history points

25  by the Probation Office and has a prior felony conviction

record consisting of a 1981 conviction in California for burglary; a 1982 conviction in California for using a forged name on a credit card; a 1983 conviction in California, second degree attempted burglary; a 1986 conviction in California for forgery; a 1987 conviction in California for being a felon in possession of a firearm; a 1990 conviction in Weld County, Colorado, for second degree burglary.  He has three separate felony convictions in 1995 in Larimer County, Colorado, for attempted theft.  And a 2000 conviction, as we've referenced earlier, in Sedgwick County, Colorado, for second degree assault on a peace officer.

Turning to the nature and circumstances of the offense, the parties agree that the government's evidence would be that in August of 2012 the law enforcement officers received reports of an individual, whom they subsequently determined to be Mr. Thiel, had been pointing a weapon at two separate sets of victims.  These incidents consisted of the defendant pointing and shooting a firearm at the residence of an individual believed to be involved in foreclosure proceedings of his property, and then later pointing a weapon at a family as he drove by their vehicle.

On the 20th of August 2012 Mr. Thiel was arrested on a warrant, and a search of his vehicle revealed a 9mm pistol. Additionally, officers located a shotgun rifle at his residence.  This weapon had an obliterated serial number.

1          Officers questioned the defendant's wife and they

2     learned -- his then-wife and learned from her that Mr. Thiel

3     had asked her to purchase the firearms for him.

4          As of today the defendant has served 260 days, or

5     approximately eight and a half months, in pretrial detention.

6          All right.  Mr. Thiel, do you wish to make any

7     statement to the Court on your own behalf before I announce

8     your sentence?

9          THE DEFENDANT:  Yes, your Honor, I would.  I would

10    like to thank the Court for giving me the opportunity to speak.

11    I do have a lengthy criminal history.  Your Honor, it started

12    back when I was younger.  I had my daughter die in my arms and

13    my wife die.  I kind of went on a binge.  Didn't care.  Tried

14    to self-destruct myself.  Used narcotics, a lot of drugs for a

15    lot of years, because I didn't care, because I lost family

16    members.  And, of course, your Honor, have been in and out of

17    prison several times.

18         I am not trying to make excuses for myself, I am just

19    kind of letting the Court know what's happened during my life

20    to create a lot of this stuff.

21         Most of my felony convictions were in California as I

22    was younger.  I've tried, your Honor, building a business here

23    in Colorado.

24         I understand the impact of this to me, people around

25    me, victims around me.  It's really affected me badly.  It's a

1    shock.  Like my mother is in the hospital.  I don't know if

2    she's going to live or die.  She just had major surgery

3    yesterday.  The impact of this crime to the other victim has

4    really affected me.  I have been in front of --

5          THE COURT:  Have you thought about how it affected

6    them?

7          THE DEFENDANT:  Yes, I have, your Honor.

8          THE COURT:  Why would you wave a gun at a family in a

9    car with three children in the car?

10          MR. BELCHER:  Your Honor, this is potential pending

11    state cases.  I think we highlighted at the change of plea

12    hearing that I've told him not to -- basically to invoke his

13    Fifth Amendment right in case these cases go to trial in the

14    state court.

15          THE COURT:  All right, fine.  I respect that.

16          Go ahead, Mr. Thiel.  I'll listen to the rest of your

17    allocution.

18          THE DEFENDANT:  Yes, your Honor.  Like I was saying, I

19    moved up to southern California from northeastern, Colorado,

20    with my wife, my mother and father.  I carried my businesses

21    over from northern Colorado to southern Colorado.  Purchased

22    property.  Bought a log cabin home.  Was in the process of

23    building a log cabin home.

24          I've tried really hard to leave my past behind.  I

25    can't change overnight, your Honor, nobody can, not from a

1    history like mine.  I have made substantial steps in the right

2    direction.  This impact -- I've impacted a lot of grief and

3    hurt on people, on my family, on my victims in this.  It's

4    really impacted me hard, your Honor.  It has.

5         I have been in front of several different judges

6    throughout my time.  I've told them I will never do this again.

7    But, your Honor, if I lose my mother, it will affect me real

8    bad, and I just say -- I want to say I am sorry.

9         THE COURT:  There's nothing I can do about your

10   mother's health.

11        THE DEFENDANT:  I understand.

12        THE COURT:  And I wish her well.  But Mr. Bohn raises

13   a good point 45 minutes ago.  Why should I think you are going

14   to act any differently now than you have since you were a young

15   man?  And I know it's true people don't turn around on a dime,

16   overnight, but you've had decades to change.

17        THE DEFENDANT:  Well, your Honor, I've lost -- in this

18   process I've lost my wife, my daughter, my grandkids, I'm not

19   supposed to have any contact with, not being able be around my

20   family, property, motor home, various tools of my business and

21   my trade.  It's impacted -- I've lost everything, your Honor.

22        I know that's not an excuse, but it has impacted me

23   very badly, and especially the way I've acted towards other

24   individuals.  I don't hurt other individuals besides family

25   members, victims.

1          And like I said, your Honor, it's impacted me very

2    bad.  I am 51 years old.  If this keeps going on I'll end up

3    spending the rest of my life in prison.  I have to do something

4    to turn around.  And I think this has impacted a lot on me,

5    very much so.

6          THE COURT:  All right.  Thank you.

7          Mr. Bohn, I granted your earlier motion to address the

8    Court after the allocution.  Do you still wish to do that?

9          MR. BOHN:  No, your Honor, not based on those

10   comments.  Thank you for the opportunity.

11         THE COURT:  All right.  Thank you.

12         The Court is prepared to rule on the defendant's

13   motion for a downward variant sentence.  This has been a very

14   difficult case for me.  The defendant's motion raises some

15   troubling issues in my mind with regard to the guideline at

16   issue here.  Of considerable concern for me is the following:

17         The range applicable to Mr. Thiel's offense conduct

18   and criminal history category has increased from 18 to 24

19   months at the outset of the Guideline era, in the mid '80s, to

20   110 to 137 months today.

21         I am also troubled by the fact that the dramatic

22   increase in the offense level in 1991 did not reflect, in my

23   view, an exercise of the commission's characteristic

24   institutional role.

25         It concerns me that the obliterated serial number

enhancement has quadrupled since the initial Guidelines without any meaningful or satisfactory explanation or rationale provided by the commission.

It also concerns me that, outside of the defendant's most recent two felony convictions, his remaining prior felonies all occurred between 18 and 32 years in the past.

Given these concerns, I was giving serious consideration to granting the defendant's motion for a downward variant sentence, at least in part, but ultimately I was persuaded by the probation officer's assessment that Mr. Thiel's actions with regard to the instant offense reflect an overriding pattern of recklessness with weapons and an unwillingness to abstain from the illegal possession of weapons.

If the instant offense, as I mentioned earlier, had involved a situation where a search of the defendant's residence resulted in finding a firearm under his mattress, let's say, I believe I would very well have granted this motion, in part. But this is not what happened here. As mentioned previously, Mr. Thiel in this case was determined to have pointed a weapon at two different sets of victims. These incidents involved the defendant pointing and shooting a firearm at the residence of an individual who was believed to be involved in foreclosure proceedings of his property, and as I mentioned earlier, pointing a weapon directly at a family

with three children as he drove by their vehicle and attempted to run them off the road. I would venture to say it's an understatement that these victims were terrified by Mr. Thiel's actions.

And, in addition, while a lot of it is quite old, the defendant's prior criminal history is in fact relevant conduct I must consider when fashioning an appropriate sentence in this case. And this relevant prior history is, indeed, disturbing and violent. The instant offense is the defendant's 12th felony conviction. He has served five separate prison sentences which do not include those offenses for which a prison sentence was ordered to be served concurrently.

In 2000 he was involved in the felony assault of two deputies. In that case he attempted to remove the weapon from one deputy, bit both deputies, and assaulted one of them by dropping onto the deputy's chest with his knees. He was sentenced to six years in prison for that offense. Less than a year after that sentence was discharged, he was discovered burglarizing a business while in possession of a firearm. He was released on bond in that case, and then seven months later he was arrested for assaulting his wife. He at that time was found to be in possession of a knife. His prison sentence in that burglary case did not end until January -- or was not discharged, rather, until January of 2011.

So after carefully balancing all of these factors,

1　I've concluded that the interests of justice are best served in

2　this case by denying the defendant's motion for a downward

3　variant sentence.

4　　　　Given all of the above, the Court intends to sentence

5　the defendant to a period of imprisonment of 110 months, to be

6　followed by a term of supervised release of three years.  Given

7　Mr. Thiel's current financial situation, the Court intends to

8　waive any fine, apart from the special assessment of $100.

9　　　　Finally, the Court has considered the need to avoid

10　unwarranted sentencing disparities among defendants with

11　similar records who have been found guilty of similar conduct.

12　Given that the Court intends to sentence the defendant within

13　the Guideline sentencing range, there will, by definition, not

14　in this case be any unwarranted disparity between defendant's

15　sentence and the sentences received by similarly situated

16　defendants convicted of this offense.

17　　　　Before I impose the Court's sentence I will afford

18　counsel a final opportunity to make any record they believe

19　appropriate.

20　　　　Mr. Bohn.

21　　　　MR. BOHN:  Not by the United States, your Honor.

22　　　　THE COURT:  Mr. Belcher.

23　　　　MR. BELCHER:  Nothing further, your Honor.

24　　　　THE COURT:  All right.  Thank you.

25　　　　The Court has heard the arguments of counsel, the

allocution of the defendant, it has considered the policy

statements of the Sentencing Guidelines, the statutory factors

set forth in 3553(a) and has reviewed the recommendations of

the probation officer.

In consideration of all the above, the Court finds no

reason to depart from the Guideline sentencing range in this

case, which does not exceed 24 months, and will impose a

sentence within that range.

In addition, the Court finds the sentence it will

impose in this case reflects the seriousness of the offense,

affords adequate deterrence to future criminal conduct and will

protect the public from further crimes of this defendant.

Accordingly, pursuant to the Sentencing Reform Act of

1984, it is the judgment of this Court that the defendant,

Lawrence Thiel, be committed to the custody of the Bureau of

Prisons to be imprisoned for a term of 110 months.

In serving this term of incarceration the Court

recommends that the director of the Bureau of Prisons give the

defendant full credit for time served in pretrial detention.

Upon release from imprisonment the defendant shall be

placed on supervised release for a period of three years.

Within 72 hours of release from the custody of the Bureau of

Prisons, the defendant shall report in person to the probation

office in the district to which the defendant is released.

While on supervised release the defendant shall not

commit another federal, state or local crime, shall not possess

a firearm, as defined in 18, United States Code, Section 921,

and shall comply with the standard conditions that have been

adopted by this Court.

The defendant shall not unlawfully possess and shall

refrain from unlawfully using a controlled substance. The

defendant shall submit to one drug test within 15 days of

release on supervised release and two periodic tests

thereafter. The defendant shall cooperate in the collection of

DNA as directed by the probation officer.

The Court finds that the following special conditions

of supervision are determined to be reasonably related to the

factors enumerated in Sections 3553(a) and 3583(d); and,

further, based on the nature and circumstances of the offense

and the history and characteristics of this particular

defendant, the following conditions do not constitute a greater

deprivation of liberty than reasonably necessary to accomplish

the goals of sentencing:

No. 1. The defendant shall participate in and

successfully complete a program of testing and/or treatment for

substance abuse as approved by the probation officer until such

time as the defendant is released from the program by the

probation officer. The defendant shall abstain from the use of

alcohol or other intoxicants during the course of treatment and

shall pay the costs of treatment as directed by the probation

1   officer.

2          No. 2.  The defendant shall participate in and

3   successfully complete a program of mental health treatment as

4   approved by the probation officer until such time as the

5   defendant is released from the program by the probation

6   officer.  The defendant shall pay the costs of treatment as

7   directed by the probation officer.  The Court authorizes the

8   probation officer to release to the treatment agency all

9   psychological reports and/or the Presentence Report for

10  continuity of treatment.

11         The defendant shall pay a special assessment of $100,

12  which shall be due and payable immediately.

13         The Court finds that the defendant does not have the

14  ability to pay a fine, so the Court will waive the payment of

15  any fine in this case, apart from the special assessment.

16         Mr. Thiel, pursuant to the Plea Agreement you entered

17  into in this case, you waive -- is there an appeal waiver in

18  this case, Mr. Belcher?

19         MR. BELCHER:  I believe so, your Honor, but let me

20  double check.  Yes, there was, your Honor.

21         THE COURT:  Okay.  One sec.  I just want to make sure

22  I read you, Mr. Thiel, the correct advisement with respect to

23  your appeal rights.

24         You waive the right, Mr. Thiel, to appeal your

25  conviction as well as the sentence I just imposed, except in

1    very limited circumstances.  To the extent you retained a right

2    to file an appeal, I am advising you that should you wish to

3    file such an appeal, a notice of appeal must be filed with the

4    clerk of the Court within 14 days after entry of judgment or

5    the right to appeal will be lost.  If you are unable to afford

6    an attorney for an appeal, the Court will appoint one to

7    represent you.  If you are unable to afford the fees for filing

8    an appeal, you may request from the Court that such filing fees

9    be waived.

10        All right.  Mr. Bohn, is there anything further from

11   the government?

12        MR. BOHN:  Not from the United States, your Honor.

13        THE COURT:  All right.  Thank you.

14        Mr. Belcher, anything further from the defendant?

15        MR. BELCHER:  No, your Honor.

16        THE COURT:  Anything further from the probation

17   officer?

18        THE PROBATION OFFICER:  No, your Honor.

19        THE COURT:  The defendant is remanded to the custody

20   of the United States Marshal.

21        Thank you.  That will be all.

22      (Proceedings concluded at 11:03 a.m.)

23

24

25

## REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 26th day of July, 2013.


_____
                                s/Gwen Daniel